**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**HUNTINGTON DIVISION**

**REGINA SHELTON, as parent and
next friend of RANDAL LEE SHELTON,**

       **Plaintiff,**

**v.**                               **Case No.: 3:10-cv-01397**

**MICHAEL J. ASTRUE,
Commissioner of the Social
Security Administration,**

       **Defendant.**

**MEMORANDUM OPINION**

This action seeks a review of the decision of the Commissioner of the Social Security Administration (hereinafter "Commissioner") denying Claimant's applications for a period of disability and disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401-433, 1381-1383f. This case is presently before the Court on the parties' cross motions for judgment on the pleadings as articulated in their briefs. (Docket Nos. 14 and 20). The parties have consented in writing to a decision by the United States Magistrate Judge. (Docket Nos. 7 and 8).

**I.**    **Extinguishment of SSI Claim**

As a preliminary matter, the Court notes that, regrettably, Plaintiff's decedent, Randy R. Shelton (hereinafter "Claimant"), passed away on October 21, 2011. (Docket No. 22). At the time of his death, Claimant was divorced, leaving behind an adult daughter and a minor son. (*Id.*). Title 42 U.S.C § 1383(b)(1)(A) provides that SSI

benefits owed to a deceased claimant shall be payable only to the claimant's "surviving spouse" or, in the case of a disabled or blind child, to a parent, if the child "was living with his parent or parents at the time of his death or within 6 months immediately preceding the month of such death."  Title 20 C.F.R. § 416.542(b)(1)(4) further states, *inter alia*, "No benefits may be paid to the estate of any unpaid recipient ... or to any survivor other than those listed in paragraph (b)(1) through (3) of this section [eligible surviving spouse or parent]."  Inasmuch as Claimant was an adult and had no surviving spouse, his claim for SSI benefits extinguished upon his death. *See Fowler v. Astrue,* 2010 WL 454765 (M.D.Fla. Feb. 9, 2010), *citing Smith v. Califano,* 597 F.2d 152 (9th Cir.) ("finding plain language of then operative version of 42 U.S.C. § 1383(b) and its legislative history made clear that Congress did not intend that commissioner make posthumous underpayments of Title XVI or SSI benefits to anyone except eligible spouse"); *Wasilauskis v. Astrue,* 2009 WL 861492 (D.Me.  Mar. 30, 2009) ("the law is clear that [plaintiff] does not meet statutory or regulatory criteria for entitlement to retroactive SSI benefits on account of her deceased son's claim"), *citing Dykes ex. rel. Brymer v. Barnhart,* 112 Fed. Appx. 463, 466 n. 4 (6th Cir.2004) ("noting, in passing, daughter of deceased claimant had conceded that SSI benefits, which were payable only to a surviving spouse, were not involved in appeal"); *Lang v. Astrue,* 2008 WL 4829946 *2 (S.D.N.Y. Nov. 5, 2008) ("Plaintiff is not entitled to seek review of the denial of [applicant's] claim to SSI benefits pursuant to 42 U.S.C. § 1383(b)(1)(A)(i), as Plaintiff is not [applicant's] surviving spouse."); *Agie v. Sullivan,* 1989 WL 281963 *2 (W.D.Pa. Dec. 18, 1989) (finding that nonpayment is the same as an underpayment; SSI benefits are only intended to provide for the needs of the eligible applicant and his surviving spouse); *See, also,* 70B Am.Jur.2d, *Social Security and Medicare* § 1852 (2011).

Consequently, the Court has limited its review to the Commissioner's denial of Claimant's application for DIB.  Having fully considered the evidence and the arguments of counsel, the Court finds that the decision of the Commissioner is supported by substantial evidence and should be affirmed.

## II.   <u>Procedural History</u>

Claimant filed applications for DIB and SSI on November 15, 2007, alleging that he had been disabled since July 7, 2002 due to "back/neck and head injury, chronic pain, depression, insomnia, asthma and panic attacks."  (Tr. at 164, 167, 182). The Social Security Administration (hereinafter "SSA") denied the claims initially and upon reconsideration. (Tr. at 25). Thereafter, Claimant requested an administrative hearing, which was conducted on July 8, 2009 by the Honorable Algernon W. Tinsley, Administrative Law Judge (hereinafter "ALJ"). (Tr. at 39-104). By decision dated February 12, 2010, the ALJ determined that Claimant was not disabled under the Social Security Act and, therefore, was not entitled to benefits. (Tr. at 25-34). The ALJ's decision became the final decision of the Commissioner on October 25, 2010 when the Appeals Council denied Claimant's request for review. (Tr. at 1-3). Claimant filed the present action seeking judicial review of the administrative decision pursuant to 42 U.S.C. §405(g). (Docket No. 2). The Commissioner filed an Answer and a Transcript of the Administrative Proceedings, and both parties filed their Briefs in Support of Judgment on the Pleadings. (Docket Nos. 10, 11, 14 and 20). As stated *supra*, Claimant died on October 21, 2011, and Plaintiff filed a Motion to Substitute Party, which was granted by this Court.  (Docket No. 23). Consequently, the motions for judgment on the pleadings are ready for resolution.

### III.  __Summary of ALJ's Decision__

Under 42 U.S.C. § 423(d)(5), a claimant seeking disability benefits has the burden of proving a disability. *See Blalock v. Richardson,* 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. 423(d)(1)(A).

The Social Security Regulations establish a five step sequential evaluation process for the adjudication of disability claims. If an individual is found "not disabled" at any step of the process, further inquiry is unnecessary and benefits are denied. 20 C.F.R. §§ 404.1520, 416.920. The first step in the sequence is determining whether a claimant is currently engaged in substantial gainful employment. *Id.* §§ 404.1520(b), 416.920(b). If the claimant is not, then the second step requires a determination of whether the claimant suffers from a severe impairment. *Id.* §§ 404.1520(c), 416.920(c). If severe impairment is present, the third inquiry is whether this impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4. (the "Listing"). *Id.* §§ 404.1520(d), 416.920(d). If the impairment does, then the claimant is found disabled and awarded benefits.

However, if the impairment does not, the adjudicator must determine the claimant's residual functional capacity ("RFC"), which is the measure of the claimant's ability to engage in substantial gainful activity despite the limitations of his or her impairments. *Id.* §§ 404.1520(e), 416.920(e). After making this determination, the next step is to ascertain whether the claimant's impairments prevent the performance of past relevant work. *Id.* §§ 404.1520(f), 416.920(f). If the impairments do prevent the

performance of past relevant work, then the claimant has established a *prima facie* case of disability, and the burden shifts to the Commissioner to produce evidence, as the final step in the process, that the claimant is able to perform other forms of substantial gainful activity, when considering the claimant's remaining physical and mental capacities, age, education, and prior work experiences. *Id.* §§ 404.1520(g), 416.920(g); *see also McLain v. Schweiker,* 715 F.2d 866, 868-69 (4th Cir. 1983). The Commissioner must establish two things: (1) that the claimant, considering his or her age, education, skills, work experience, and physical shortcomings has the capacity to perform an alternative job, and (2) that the specific job exists in significant numbers in the national economy. *McLamore v. Weinberger,* 538 F.2d 572, 574 (4th Cir. 1976).

In this particular case, the ALJ determined as a preliminary matter that Claimant met the insured status requirements of the Social Security Act through December 31, 2007. (Tr. at 27, Finding No. 1). At the first step of the sequential evaluation, the ALJ found that Claimant had not engaged in substantial gainful activity since July 7, 2002, the date of the alleged onset of disability. (Tr. at 27, Finding No. 2). Turning to the second step of the evaluation, the ALJ determined that Claimant had the following severe impairments: chronic strains of the cervical, thoracic, and lumbar spine. (Tr. at 27, Finding No. 3). The ALJ considered Claimant's alleged impairments of asthma, insomnia, depression, and panic disorder and found them to be non-severe. (Tr. at 27-29). Under the third inquiry, the ALJ concluded that Claimant did not have an impairment or combination of impairments that met or medically equaled one of the impairments contained in the Listing. (Tr. at 29, Finding No. 4). Consequently, the ALJ assessed Claimant's residual functional capacity as the following:

> [T]he claimant has the residual functional capacity to perform medium work as defined in 20 CFR 404.1567(c) and 416.967(c). He should avoid extreme cold weather, vibrations, fumes and odors, and hazards.

(Tr. at 29-32, Finding No. 5).

In comparing the physical and mental demands of Claimant's past relevant work as a stocker and printer technician, the ALJ determined that Claimant was able to perform those jobs as they were actually performed and as they are generally performed. (Tr. at 32, Finding No. 6). Furthermore, the ALJ considered that (1) Claimant was 32 years old on the disability onset date, defined as a younger individual aged 18-49 years old; (2) he had a limited education, but could communicate in English; and (3) transferability of work skills was irrelevant, because the Medical-Vocational Rules found in 20 C.F.R. Part 404, Subpart P, Appendix 2, supported a finding of "not disabled" regardless of transferability of skills. (Tr. at 32-33). Relying upon the testimony of a vocational expert, the ALJ concluded that additional jobs existed in significant numbers in the national and regional economy that Claimant could perform, including inspector, kitchen worker, grader/sorter, machine tender, assembler, and handpacker. *Id.* Accordingly, Claimant was not disabled as defined in the Social Security Act. (Tr. at 33-34, Finding No. 7).

## IV.    **Scope of Review**

The issue before the Court is whether the final decision of the Commissioner is based upon an appropriate application of the law and is supported by substantial evidence. In *Blalock v. Richardson,* the Fourth Circuit Court of Appeals defined "substantial evidence" to be:

> [E]vidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a

refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

*Blalock v. Richardson*, 483 F.2d 773, 776 (4th Cir. 1972) (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966). This Court is not charged with conducting a *de novo* review of the evidence.  Instead, the Court's function is to scrutinize the totality of the record and determine whether substantial evidence exists to support the conclusion of the Commissioner. *Hays v. Sullivan,* 907 F.2d 1453, 1456 (4th Cir. 1990).  The decision for the Court to make is "not whether the claimant is disabled, but whether the ALJ's finding of no disability is supported by substantial evidence." *Johnson v. Barnhart,* 434 F. 3d 650,653 (4th Cir. 2005), citing *Craig v. Chater,* 76 F.3d 585, 589 (4th Cir. 2001).  If substantial evidence exists, then the Court must affirm the decision of the Commissioner "even should the court disagree with such decision." *Blalock v. Richardson, supra* at 775.

A careful review of the record reveals that the decision of the Commissioner denying Claimant's application for DIB is based upon an accurate application of the law and is supported by substantial evidence.

## V.    **Claimant's Background**

Claimant was thirty-nine years old at the time of his administrative hearing. (Tr. at 45). He completed the sixth grade in school and later obtained a GED. (Tr. at 46). Claimant's prior employment included work as a carpenter's helper, printer technician, and stocker. (Tr. at 48-52).  Claimant's primary language was English.

## VI.   **Plaintiff's Challenges to the Commissioner's Decision**

Plaintiff challenges the decision of the Commissioner on the following grounds:

1.     The ALJ failed to develop the record regarding Claimant's mental impairments;

2.     The ALJ failed to consider and weigh the testimony of Claimant's mother;

3.     The ALJ failed to evaluate the extent to which Claimant's alcohol and drug use contributed to his disability;

4.     The ALJ disregarded Claimant's mental impairments when evaluating his ability to follow a treatment regimen;

5.     The ALJ failed to fully consider Claimant's musculoskeletal impairments and the side effects of his pain medications;

6.     The ALJ inadequately evaluated Claimant's credibility;

7.     The ALJ failed to properly consider Claimant's combined impairments;

8.     The ALJ ignored the assessments of Claimant's mental health professionals;

9.     The ALJ substituted his opinions for the opinions of Claimant's treating physician; and

10.    The ALJ failed to rebut the presumption of disability.

(Docket No. 14).  The Court has considered each of Claimant's alleged challenges and, for the reasons that follow, finds that they are not persuasive.

## VII.   **Relevant Evidence**

The Court has reviewed the Transcript of Proceedings in its entirety, including substantial medical evidence of record. Although Plaintiff's claim is now limited to the Commissioner's denial of Claimant's application for DIB, records prepared after Claimant's last insured date were reviewed to obtain a longitudinal picture of his physical and mental conditions. A summary of the most relevant health care

information follows.

### A.    Treatment Records—During Insured Period

Claimant alleges that his disability began on July 7, 2002 after he sustained an injury to his head, neck and upper back while at work. An MRI of Claimant's cervical spine was performed on July 26, 2002 and was interpreted as normal.  (Tr. at 242).  On October 8, 2003, Claimant initiated treatment with Dr. R. Allen Young, a family medicine specialist at St. Mary's Occupational Health Center. (Tr. at 350-51). At that time, Claimant described his injury to Dr. Young, stating that he was working in construction when a three quarters inch sheet of plywood was dropped about eight feet onto his head. The impact caused his neck to snap forward and his lower back to twist. (*Id.*).  Claimant complained of ongoing pain in his bilateral lumbar and cervical spine with radiation to his right arm and left leg. Claimant reported having received physical therapy, but denied having an evaluation by a neurosurgeon or pain medicine specialist. Dr. Young obtained a comprehensive medical history from Claimant, which was positive for depression, anxiety, and suicidal thoughts. (*Id.*). On examination, Dr. Young found Claimant's range of motion to be normal; his strength and tone were normal; he was neurologically intact; and psychologically, he had normal judgment, insight, orientation, speech and affect. Dr. Young diagnosed sprains of the neck and thoracic spine. He recommended that Claimant have additional physical therapy, a pain management consultation, and vocational rehabilitation, noting that Claimant's chronic pain might prevent him from returning to his prior line of work. Dr. Young prescribed Robaxin (a muscle relaxant), Naprosyn (a non-steroidal anti-inflammatory), and Darvocet (an opiod pain reliever with acetaminophen) to treat Claimant's symptoms. (*Id.*).

Claimant returned to Dr. Young's office on October 22, 2003.  (Tr. at 246-47).

Dr. Young noted that Claimant scored a 25 on a depression scale and documented that Claimant had a mildly depressed mood with flat affect, but no psychotic features. (Tr. at 248). Claimant reported insomnia, but denied suicidal thoughts. Otherwise, his history, complaints, and diagnoses remained the same. MRI films of Claimant's neck and lumbar spine were normal; accordingly, Dr. Young did not feel a neurosurgery consultation was indicated. (*Id.*) He decided to arrange an appointment for Claimant with the Pain Clinic at St. Mary's Medical Center and told Claimant to return in two weeks, so that his mood could be could re-evaluated.

On November 19, 2003, Claimant returned, complaining that he was depressed, irritable, and continued to have problems sleeping. (Tr. at 250). He reported taking his mother's Zoloft to help relieve his symptoms. Dr. Young noted that Claimant's mood was a problem and that he had trouble concentrating. Claimant again scored a 25 on a depression scale, which Dr. Young interpreted as severe depression. He wrote Claimant a prescription for Zoloft and decided to request a psychiatric consultation in light of Claimant's comments that counseling and medications had helped him in the past. He also recommended chiropractic care to alleviate Claimant's musculoskeletal pain until his January appointment at the Pain Clinic. (Tr. at 251).

Claimant returned to Dr. Young's office on December 2, 2003. (Tr. at 252-53). He stated that he had started chiropractic care and felt it might be helping some. Dr. Young noted that Worker's Compensation had denied coverage for Darvocet and Zoloft, but Claimant indicated that he would continue buying the Darvocet with his own money and would borrow Zoloft from his mother. Worker's Compensation subsequently denied Dr. Young's request for a psychiatric consultation of Claimant. (Tr. at 253).

Claimant presented for follow-up with Dr. Young on December 16, 2003 and December 30, 2003. (Tr. at 254-257). His symptoms remained the same, and his medication regimen was not changed.  Dr. Young received authorization for Claimant to receive additional physical therapy; accordingly, he wrote an order for therapy and instructed Claimant to return in four weeks.  (*Id.*).

Dr. Young examined Claimant once in January 2004 with no changes noted.  (Tr. at 257-258). On February 10, 2004, Dr. Young received a letter from the pain clinic, confirming that Claimant had been examined and recommending cervical epidural injections to relieve his pain. (Tr. at 259). Claimant returned to Dr. Young's office for follow-up on February 24, 2004.  (Tr. at 260-61).  He reported that he was doing better. He had not restarted physical therapy due to a lack of transportation, but had recently found a new girlfriend, who was willing to drive him. Dr. Young observed that Claimant's mood was more pleasant, although his affect was still flat. Claimant indicated that he had a hearing with the Worker's Compensation judge to challenge the denial of his medications and other recommended therapies. Dr. Young was hopeful that Worker's Compensation would approve psychiatric and vocational rehabilitation consultations. (*Id.*).

On March 23, 2004, Claimant told Dr. Young that he was doing better and that physical therapy seemed to help, although he still had pain and his depression had worsened. (Tr. at 263-64). Dr. Young suggested that Claimant look for work, although not in construction or heavy labor, and to return in two months. (*Id.*). On May 7, 2004, Dr. Young received a letter from the pain clinic recommending that Claimant be seen in a psychologically based program such as Oasis and avoid addictive medications such as opioids and benzodiazepines.  (Tr. at 265).

Claimant returned to Dr. Young on May 18, 2004, complaining of worsening depression. (Tr. at 266-67). He confirmed that Zoloft was still not covered by Worker's Compensation, and he could not afford it. Dr. Young documented that Claimant had a depressed mood with flat affect, although no psychotic features. His judgment, insight, and orientation were appropriate. Dr. Young felt that Claimant needed to see a psychiatrist in light of his severe depression and anxiety.  He opined that Claimant "has been and remains temporarily and totally disabled since October 8, 2003 to the present and will remain so at least another two months (till 7/18/2004)." (*Id.*). On July 13, 2004, Dr. Young learned that Workers Compensation was withholding a psychiatric consultation. (Tr. at 270). However, on July 23, 2004, Workers Compensation suggested sending Claimant to the Oasis Pain Clinic. Six days later, Dr. Young scheduled an appointment for Claimant to see Dr. Devlin, a psychologist at the Pain Clinic at Cabell Huntington Hospital. (Tr. at 271). On August 5, 2004, Dr. Young received notice that Claimant had failed to show up for the appointment. (*Id.*).  Dr. Young rescheduled the appointment to August 18, 2004.

On August 26, 2004, Dr. Young spoke with Mr. Devlin regarding his evaluation of Claimant. (Tr. at 309). Mr. Devlin opined that Claimant had significant depression and anxiety and would benefit from psychotropic medications and psychotherapy. He felt that Claimant's work-related injury had triggered these symptoms and had resulted in many problems in Claimant's life, including the loss of his wife, children, and house. (*Id.*). Dr. Young prescribed Ambien to add to the Zoloft prescription in order to treat Claimant's insomnia.  (*Id.*).

Claimant returned to Dr. Young's office on September 7, 2004. (Tr. at 310-11). He complained that his neck and back pain continued and were worsening. He reported

that he only slept 4-5 hours each night and had bad dreams. His depression persisted, but he denied suicidal thoughts.  He told Dr. Young that he wanted to return to work, but felt he would have to live with the pain.  He also mentioned that he had not been to church since his injury. Dr. Young prescribed Valium, told Claimant to return in 1-2 weeks and recommended that he go to church at least once before their next scheduled visit. Dr. Young also planned to make another request to Worker's Compensation to approve Claimant's psychiatric counseling and medications.  (*Id.*).

When Claimant returned on September 16, 2004, he reported that he was sleeping better with Valium and felt more motivated and less depressed.  (Tr. at 312-13). He had started reading his Bible again, but had not returned to church. Dr. Young observed that Claimant seemed more pleasant and even smiled once or twice. He was told to return in 4-6 weeks and to try to go back to church at least once in the interim. (*Id.*). By the time Claimant returned on October 19, 2004, Dr. Young had received authorizations for Claimant to receive epidural injections, psychiatric assessment, and psychotropic medications.  (Tr. at 314-15).

Claimant returned to Dr. Young's office on November 16 and December 27, 2004, for routine follow-up. (Tr. at 316-17, 319-21). His physical examination remained the same on both visits, and his medication regimen was continued. Similarly, Claimant's visits on January 7 and 17, 2005 revealed no significant changes.  (Tr. at 324-25, 327-28).  He continued to be depressed and admitted that he had not followed Dr. Young's advice to return to church. His medications were continued.  (*Id.*).

On February 25, 2005, Claimant again saw Dr. Young in follow-up. (Tr. at 330-33). His pain symptoms persisted. He reported that he had not yet received the epidural injections and was waiting to hear from the pain clinic. Dr. Young observed that

Claimant's chronic depression was related to his ongoing pain and inactivity, and he still needed to see a psychiatrist. Once again, Dr. Young requested authorization from Worker's Compensation for psychiatric evaluation and counseling. (*Id.*).

Claimant next saw Dr. Young on April 29, 2005. (Tr. at 336-37). Dr. Young learned that Claimant still had not received epidural injections, although they had been authorized by Worker's Compensation. He also documented that Claimant's medications were no longer being covered, and Claimant could not afford to purchase them. Claimant remained depressed, and Dr. Young noted that Worker's Compensation had authorized a psychiatric examination to determine if Claimant's emotional problems were related to the original back, neck, and head injury.

On June 29, 2005, Claimant reported to Dr. Young that his symptoms were basically stable, with some days being worse than others. (Tr. at 338-39). He was waiting to have the pain clinic schedule his injections. Approximately ten days later, Dr. Young received a telephone call from a local jail advising that Claimant was incarcerated for domestic violence and assault and requesting a list of his medications. (Tr. at 339).

Claimant did not return to Dr. Young's office until September 15, 2005. (Tr. at 340-41). Dr. Young assessed Claimant and found him to be essentially the same. Claimant returned one month later and again had no significant changes in his condition, complaints, or treatment course. (Tr. at 342-344). Dr. Young documented that Claimant was not working and had no current plans to return to work. They awaited pain clinic treatments and a psychiatric evaluation. (Tr. at 346). A few days later, Worker's Compensation notified Dr. Young that it would no longer authorize the epidural injections because Claimant had been non-compliant. The authorization for a psychiatric consultation was also revoked. (Tr. at 346-47).

In February 2006, Dr. Young made another attempt to persuade Worker's Compensation to authorize epidural injections and a psychiatric evaluation for Claimant. (Tr. at 356). On Claimant's next appointment, Dr. Young refilled the prescriptions for Robaxin, Valium, and Hydrocodone and instructed Claimant to return in three months. (Tr. at 357-58). On May 12, 2006, Worker's Compensation notified Dr. Young that Claimant had been assessed as reaching maximum medical improvement and was awarded a 10% permanent partial disability. (Tr. at 359).

On July 5, 2006, Dr. Young examined Claimant and found that his symptoms had "narrowed down some in that he has more pain in the right side of the neck in the trapezius area now and the lower back pain may have decreased some." (Tr. at 360). Vocational Rehabilitation notified Dr. Young that it intended to schedule Claimant for a functional capacity evaluation in the near future. Dr. Young thought Claimant might benefit from trigger point injections in the C-7 area and requested that Worker's Compensation provide those to Claimant. Worker's Compensation denied the request. (Tr. at 361).

On July 25, 2006, Candace Duty, a chiropractor, prepared a letter detailing her evaluation of Claimant at the request of his lawyer for purposes of contesting the permanent partial impairment rating given by Worker's Compensation. (Tr. at 273-81). She reported that Claimant had pain in his right hand that affected all of his fingers and radiated to his lower cervical spine and down his lumbar spine to his left lateral leg and the toes. Claimant described the pain as a constant dull ache that occasionally became sharp and intense. He attributed the pain to his work-related injury on July 8, 2002. He also complained of headaches associated with his neck injury that were accompanied by stomach pain and nausea. Claimant's social history revealed that he was divorced and

the father of two children, ages 11 and 17.  Dr. Duty reviewed numerous medical records and performed a chiropractic examination of Claimant. She concluded that he had lumbar, cervical, and thoracic sprains; chronic pain syndrome; mild sensory carpal tunnel syndrome involving the right median nerve; and psychiatric problems including depression and anxiety. She estimated that Claimant has a total permanent partial disability rating of 25%. (Tr. at 281).

That same month, Vocational Rehabilitation authorized Dr. Young to perform a functional capacity evaluation of Claimant, which Dr. Young scheduled on July 31, 2006.  (Tr. at 362).  When Claimant failed to appear, the examination was rescheduled to August 8, 2006. (*Id.*). As of October 5, 2006, the evaluation had not been completed. (Tr. at 363). On that date, Dr. Young saw Claimant in the office and refilled his prescriptions.

On January 17, 2007, Dr. Young again saw Claimant for an office visit.  (Tr. at 366-67). Claimant reported that he continued to use Lortab and Robaxin for his chronic pain, and these medications kept his pain in check.  He told Dr. Young that he spent his days sitting around the house and had no plans to return to work.  He had started to go back to church, which was positive, but otherwise, he rarely left his house. Dr. Young decided to schedule Claimant for some trigger point injections in the future. On February 16, 2007, Dr. Young performed the injections in his office. (Tr. at 368). Claimant reported that the injections helped reduce his right-sided neck pain.  (Tr. at 369).  Accordingly, on August 10, 2007, Dr. Young administered trigger point injections to Claimant's lower back. (Tr. at 376). Claimant reported that these injections did not help him. (Tr. at 378). Dr. Young encouraged Claimant to be more active and think about getting some kind of work.  (*Id.*).

On October 18, 2007, Claimant returned to Dr. Young's office for his routine follow-up. (Tr. at 379-80). He stated that he felt some better and was trying to get himself together mentally. He indicated that he was thinking of looking for work, although he had not started that process yet. Claimant acknowledged that he still had pain and insomnia and requested a prescription for a sleep aid. Dr. Young decided to write a prescription for Elavil, rather than the Valium used by Claimant in the past. Once again, Dr. Young encouraged Claimant to be more active and consider returning to some kind of work. (*Id.*).

### B.    Treatment Records—Post Insured Period

Claimant returned to Dr. Young's office on February 5, 2008. (Tr. at 531-32). He told Dr. Young that he had not returned to work and felt his inability was related more to mental problems than physical ones. He advised Dr. Young that he had applied for SSI. Claimant reported persistent problems with insomnia and requested a prescription for Valium, which Dr. Young refused to write. Instead, he told Claimant to use Elavil. (*Id.*). When Claimant returned to Dr. Young's office on September 22, 2008 for follow-up, his condition was the same. (Tr. at 8-9). Dr. Young kept Claimant on the same medication regimen.

On January 5, 2009, Claimant was voluntarily admitted to the behavioral health unit at St. Mary's Medical Center with complaints of depression. (Tr. at 657-719). He reported a 30 pound weight loss, insomnia, chronic pain, and a racing heartbeat. He stated that he heard voices and saw angels and had thoughts of suicide. Claimant described a long history of depression and was noted to have poor coping skills. He stated that he had taken Paxil and Prozac in the past, but had not continued taking them. He denied prior psychiatric hospitalizations. Claimant was interviewed by Dr.

Kenneth Fink, a local psychiatrist, who described Claimant as appearing religiously preoccupied and depressed. After assessing Claimant, Dr. Fink ordered him hospitalized and placed on suicide watch. He treated Claimant with Elavil for depression and Geodon for psychosis. While in the hospital, Claimant attended individual and group therapy. By January 14, 2009, Claimant was sleeping and eating well with reported improvement in his memory and concentration. He was discharged home in stable condition accompanied by his daughter and was instructed to receive follow-up care at Prestera Centers for Mental Health ('Prestera"). (*Id.*).  His final diagnoses were Major Depressive Disorder, recurrent, with psychotic features; Dysthymia; Anxiety Disorder, NOS; Pain Disorder; episodic alcohol dependence; cannabis abuse; nicotine abuse; hypertension; childhood asthma by history; dental caries; and chronic pain. Claimant was also given a provisional diagnosis of Schizoaffective Disorder.  (Tr. at 660).

On February 11, 2009, Claimant underwent a comprehensive diagnostic psychiatric evaluation at Prestera performed by Dr. Jawaid Latif. (Tr. at 539-546). Dr. Latif recorded that Claimant had a long history of depression, which had gotten worse in the past eight years. He did not receive treatment for it, because he did not have a medical card and could not afford it. Claimant reported multiple depressive symptoms as well as signs of paranoia and anxiety. He had occasional auditory hallucinations. According to Claimant, his symptoms had improved since his hospitalization and while taking multiple psychotropic medications including Elavil, Prozac, Atarax, Remeron and Geodon. He did not have side effects from the medications and stated that he had been compliant with his regimen. Dr. Latif observed that Claimant was malodorous and unkempt, but was alert and oriented to the day, date, month, and year. He was cooperative and polite and denied suicidal or homicidal thoughts or paranoia. He did

admit to muffled auditory hallucinations. Dr. Latif diagnosed Claimant with Major Depression, recurrent, with psychotic features versus Schizoaffective Disorder; panic attacks; alcohol and marijuana dependence, in partial remission; and chronic pain. His Global Assessment of Functioning ("GAF") score was 55-60.[1] Dr. Latif instructed Claimant to continue taking his medications and return to the clinic in 6-8 weeks.

On March 16, 2009, Claimant was reevaluated at Prestera. (Tr. at 606-07). He complained of being suicidal and nervous. He admitted to drinking a case of beer every day. On mental status examination, Claimant was noted be casually dressed and unkempt. His attitude was cooperative; his intelligence was below average; his motoric behavior and sensorium were normal; his thought content was fairly normal, but his thought process was somewhat paranoid. Claimant's mood was described as anxious and nervous; his concentration was poor. He reported hearing "Devils' voices." (*Id*.). The examiner assessed Claimant as suffering from alcohol withdrawal/dependence; and Major Depressive Disorder, severe and recurrent with psychotic features. Claimant's insight, judgment, and prognosis were considered to be fair to poor, and his GAF score was 30.[2] Claimant was admitted to Prestera's Crisis Residential Unit ("CRU") for depression, hallucinations, alcohol detoxification, and insomnia. (Tr. at 608). On initial assessment, Claimant was described as stuporous with hallucinations and paranoia. A functional assessment instrument was completed, which reflected mild dysfunction in

---

[1] The GAF scale is a tool for rating a person's overall psychological functioning on a scale of 0-100. This rating tool is regularly used by mental health professionals and is recognized by the American Psychiatric Association in its *Diagnostic and Statistical Manual of Mental Disorders (DSM) IV-Text Revision*. A score of 51-60 indicates moderate symptoms OR moderate difficulty in social, occupational, or school functioning. On the GAF scale, a higher score indicates a less severe impairment.

[2] A GAF score of 21-30 reflects that "behavior is considerably influenced by delusions or hallucinations OR serious impairment in communication or judgment (e.g. sometimes incoherent, acts grossly inappropriately, suicidal preoccupation) OR inability to function in almost all areas (e.g. stays in bed all day, no job, home, or friends).

self care and activities of community living; marked dysfunction in social interpersonal and family function, as well as concentration and task performance; and moderate dysfunction in maladaptive, dangerous and impulsive behaviors. (Tr. at 584-601). The following day, Ken Fitzwater, MA, LPC, prepared a clinical interpretative summary note in which he recounted that Claimant had been referred to the CRU by an emergency department physician at Cabell Huntington Hospital due to acute psychiatric symptoms, including suicidal ideation, hallucinations, depression, anxiety, and hopelessness.  (Tr. at 604).   Mr. Fitzwater noted that Claimant's symptoms interfered with his safety, concentration, and ability to maintain social contacts.  (*Id.*).

On March 27, 2009, Mr. Fitzwater completed a psychiatric evaluation of Claimant. (Tr. at 579-80). Mr. Fitzwater noted that Claimant was referred to an Intensive Outpatient Program ("IOP") from the CRU for continued care after stabilization of his acute psychiatric symptoms earlier in the month. He remained at risk for rehospitalization due to possible relapse. Claimant admitted that he had a long history of alcohol abuse that started when he was ten years old. In addition, he used marijuana on a daily basis, although he denied using it or drinking alcohol since his admission to the CRU. He further admitted to having been incarcerated in the past for domestic battery, destruction of property, and DUI. Mr. Fitzwater assessed Claimant's mental status, finding his thought process to be concrete; his thought content to be non-suicidal; his attitude to be bland to indifferent, and his appearance to be unkempt, malodorous, and disheveled. (*Id.*).  Claimant reported that he heard voices telling him to "give up and stop bringing shame to his family." He also related his prior experience as a preacher in a fundamentalist Christian church run by a group of people who allegedly were like a "cult" in their "attempt to control all aspects of members' lives." (*Id.*). Mr.

Fitzwater assessed Claimant's GAF score at 39-40[3] and his prognosis to be guarded due to non-compliance, chronic substance abuse, chaotic family life, and no incentive to take charge of his life and get better.  (*Id.*).

On April 1, 2009, clinician Debra Smith completed a clinical interpretative summary note in which she documented that Claimant was complaining of increased depression and anxiety and rated the following symptoms as severe: self neglect, withdrawal, impulsivity, poor judgment, hallucinations, poor concentration, depression, anxiety, hopelessness and helplessness, distractibility, and loss of interest in activities. (Tr. at 565).  On mental status examination, Ms. Smith found Claimant to be oriented times 4; his speech to be pressured; his appearance to be normal; his thought content to be blocked; and his sociability to be withdrawn. (Tr. at 572). She determined that Claimant had a mild dysfunction in self care and activities of community living; marked dysfunction in family and social activities, concentration, and task performance and no dysfunction in maladaptive, dangerous or impulsive behaviors. (Tr. at 573-77). His psychiatric diagnoses remained the same.

On April 20, 2009, Claimant underwent another psychiatric assessment at Prestera. (Tr. at 631-32). Claimant admitted that he had starting drinking beer again and had stopped taking his medications. He reported hearing voices and feeling depressed. His mental status examination revealed paranoid thought content and process; depressed mood; anxious and nervous affect; fair to poor insight and judgment. (*Id.*). His GAF score was 30. Based upon his acute symptoms, Claimant was readmitted

---

[3]   A GAF score of 31-40 indicates that the patient had some impairment in reality testing or communication (e.g. speech is at times illogical, obscure, or irrelevant) OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g. depressed man avoids friends, neglects family, and is unable to work; child frequently beats up younger children, is defiant at home, and is failing at school).

to the CRU to stabilize his hallucinations, suicidal thoughts, and depression.  (Tr. at 633). A functional assessment instrument was completed which noted that Claimant had moderate dysfunction in self-care; mild dysfunction in activities of community living; and marked dysfunction in social, interpersonal and family activities, concentration, task performance, and maladaptive, dangerous, and impulsive behaviors. (Tr. at 647-52). He was diagnosed with Major Depressive Disorder, severe with psychosis; personality disorder; and alcohol dependence. His GAF score remained at 30. (Tr. at 652-53).  Claimant was discharged from the CRU on April 27, 2009.  (Tr. at 625). He reported feeling less depressed, having fewer hallucinations, and sleeping better. His functional assessment also showed improvement with only mild or moderate dysfunction noted in all domains.  (Tr. at 617-620).

On May 11, 2009, Claimant returned to Dr. Young's office for a regular follow-up. (Tr. at 748-49). He reported that he still experienced pain in the lower back and left leg. He requested Neurontin to treat the symptoms, but Dr. Young declined to write a prescription in light of Claimant's recent psychiatric issues. Dr. Young felt adding a new medication was not reasonable at that time. Claimant's condition was essentially the same on August 19, 2009 and December 21, 2009 when Claimant returned for routine examinations. (Tr. at 13-17). Dr. Young documented that Claimant was in a pleasant mood on both visits with a normal affect and no signs of psychosis or suicidal ideations.

Claimant returned to Dr. Young on April 21, 2010.  (Tr. at 18-19).  He complained of bilateral neck and lower back pain that radiated to his left leg. His mood was pleasant with an appropriate affect and no signs of psychosis. Dr. Young recommended activity as tolerated. The final office record provided by Dr. Young's office was dated July 26, 2010. (Tr. at 20-21). On this date, Dr. Young noted that Claimant's pain had stabilized

with an increase in his medications. (*Id.*).

According to recent court filings, on October 21, 2011, Claimant overdosed on a combination of medications. (Docket No. 22 at 2). The manner of death was determined by the deputy chief medical examiner to be accidental.

### C.    Agency Evaluations

On January 26, 2008, Lisa Tate, a licensed psychologist, performed a psychological evaluation of Claimant at the request of West Virginia's Disability Determination Service ("DDS"). (Tr. at 416-420). Ms. Tate observed that Claimant was casually dressed and his grooming and personal hygiene were good. She recorded that Claimant lived with his mother, sister, and niece in Huntington, West Virginia. He reported depression, panic attacks and medical problems.  He described his depression as lasting approximately eight years and worsening over time, although he had significant periods without any symptoms. When he experienced depression, his symptoms included loss of energy, loss of interest in activities, social withdrawal, sleep difficulty, and feelings of hopelessness and helplessness. As far as panic attacks, Claimant reported that he had experienced them all of this life and had approximately two each day that lasted for a couple of minutes to all night. His symptoms included difficulty breathing, rapid heart rate, chest pain, increased perspiration, feeling of impending doom, and feeling as if he was having a heart attack. (*Id.*). Because of these attacks, Claimant did not want to be around other people. Claimant denied a history of substance abuse or related arrests, as well as mental health treatment. Ms. Tate's mental status examination revealed the following:  Claimant was alert and oriented; his mood was depressed; his thought processes were logical and coherent and his thought content was without hallucinations or obsessive thoughts; his insight was fair; his perception,

judgment, and immediate memory were normal; his recent memory was mildly deficient, but his remote memory was normal; his concentration was normal; and he denied suicidal or homicidal ideations. Ms. Tate diagnosed Major Depressive Disorder, recurrent and severe; Panic Disorder with Agoraphobia; chronic pain, asthma, stomach pain, and hypertension. Nevertheless, she found Claimant's concentration, pace, and persistence to be within normal limits. (*Id.*).

On January 31, 2008, Dr. Kip Beard performed an internal medicine examination at the request of the DDS. (Tr. at 423-27). Claimant complained of neck pain since his injury, as well as pain in his left leg. He reported a longstanding history of asthma, depression, and panic attacks. Upon examination, Dr. Beard noted that Claimant used no ambulatory aids or assistive devices. He had a normal gait and was comfortable both in the seated and supine positions. He expressed some mild pain of the cervical spine on motion testing, but had a normal range of motion. His knees revealed no tenderness, swelling, warmth, redness or crepitation. Claimant was able to stand on one leg at a time without difficulty. His lumbar spine had a normal range of motion and his straight leg raising test was negative. He showed no signs of neurological impairment and could heel-walk, toe-walk, tandem walk and squat. Dr. Beard diagnosed chronic cervical thoracic strain; left leg pain; and asthma/chronic obstructive pulmonary disease. However, he found no evidence of neurological impairment, weakness, atrophy, nerve impingement, or myelopathy. (*Id.*).

On February 5, 2008, Jim Capage, Ph.D., completed a Psychiatric Review Technique Form, in which he found that Claimant had evidence of affective and anxiety-related disorders, but these conditions were non-severe. (Tr. at 428-441). In the "paragraph B" criteria, Dr. Capage assessed Claimant as having mild limitations in

activities of daily living and social functioning, and no limitations in concentration, persistence, or pace, with no episodes of decompensation of extended duration. (*Id.*). There was no evidence of "paragraph C" criteria.  Dr. Capage concluded that Claimant retained the mental-emotional capacity to engage in substantial gainful activities.  (Tr. at 440).

Dr. Fulvio Franyutti completed a Physical Residual Functional Capacity Assessment on February 25, 2008, relying upon medical records from Dr. Young and the physical examination performed by Dr. Beard. (Tr. at 443-450). He found that Claimant was capable of occasionally lifting and carrying 50 pounds and frequently lifting and carrying 25 pounds. Claimant could stand, walk, and sit about six hours, each, in a standard eight-hour workday.  He had no limitations in his ability to push and pull. Dr. Franyutti found some postural limitations; including, restrictions on Claimant's climbing, crouching, and crawling, allowing them only occasionally. Claimant had no manipulative, visual, or communicative limitations. His environmental limitations included avoiding concentrated exposure to extreme cold, vibration, fumes, odors, dust, gases, and hazards, such as machinery and heights. (*Id.*). Dr. Franyutti felt Claimant was only partially credible, because his allegations were only partially supported by the objective medical findings.

Dr. Franyutti's evaluation was apparently reviewed by Dr. Marcel Lambrechts on April 23, 3008, who agreed with Dr. Franyutti's RFC assessment.[4]  Debra Lilly, Ph.D., apparently reviewed Dr. Capage's Psychiatric Review Technique Form on May 3, 2008

---

[4]  Dr. Lambrechts erroneously refers to Dr. Franyutti as Dr. Egnor.

and also affirmed his conclusions.[5]

## VIII.  <u>Analysis</u>

Of the ten challenges raised by Plaintiff, the following four deal exclusively with the ALJ's treatment of records and opinions provided by Prestera:

1.      The ALJ failed to develop the record regarding Claimant's mental impairments;

2.      The ALJ disregarded Claimant's mental impairments when evaluating his ability to follow a treatment regimen;

3.      The ALJ ignored the assessments of Claimant's mental health professionals; and

4.      The ALJ substituted his opinions for the opinions of Claimant's treating physician.

Because Claimant did not receive treatment from Prestera until February 2009, well after his last insured date of December 31, 2007, these challenges are no longer germane to the issues in dispute. Thus, the Court need not address them. Regarding the remaining challenges raised by Claimant, the Court finds that they lack merit. Therefore, the Court further finds that the Commissioner's determination that Claimant was not disabled on or before December 31, 2007 is supported by substantial evidence.

### A.      Failure to Consider and Weigh the Testimony of Claimant's Mother

Plaintiff argues that the ALJ failed to consider and weigh the testimony of Claimant's mother, Janet Shelton. According to Plaintiff, the Social Security regulations require the ALJ to explain the weight he gave to the testimony of every witness, even the

---

[5] Dr. Lilly references a Psychiatric Review Technique Form completed on March 12, 2008.  Dr. Capage completed the form on February 5, 2008; however, as it is the only other such form in Claimant's file, the Court concludes that Dr. Lilly was referring to Dr. Capage's February assessment.

non-medical ones, and, when applicable, to provide reasons for discounting that testimony. (Docket No. 14 at 8).  The Commissioner concedes that the ALJ erred by not explicitly analyzing or crediting Mrs. Shelton's testimony, but contends that this error was harmless, because her testimony was merely cumulative of the testimony provided by the Claimant.  (Docket No. 20 at 17).

A review of the ALJ's written decision confirms that he ignored Mrs. Shelton's testimony, although he certainly was required, at a minimum, to consider it. *See* SSR 06-03p; SSR 85-16. Nevertheless, the Court agrees that the ALJ's error was harmless in light of the current complexion of the case. Mrs. Shelton testified primarily about Claimant's depression, anxiety, and auditory hallucinations. She stated that her son had a history of hearing "voices" that dated back to childhood, but the condition had recently worsened, causing him to seek medical attention. As her son's mental condition deteriorated, Mrs. Shelton assumed a larger role in his daily activities, helping him shop, do laundry, and remember to take medications and keep physician appointments. (Tr. at 81-87). Mrs. Shelton's testimony corroborated Claimant's more detailed testimony on the same subjects. The ALJ explicitly discounted Claimant's testimony, finding that his hallucinations, depression, and anxiety occurred in relation to heavy alcohol and marijuana use and his mental health hospitalizations corresponded in time to substance abuse binges. (Tr. at 31).  Accordingly, although the ALJ did not separately address Mrs. Shelton's testimony, the reasons for discounting her statements undoubtedly mirrored those given for disregarding Claimant's similar testimony. As such, the Court is able to determine whether substantial evidence supports the ALJ's conclusions and, thus, remand is not necessary. *See Brescia v. Astrue,* 287 Fed. Appx. 626, 630 (10th Cir. 2008) (the ALJ is not required to separately address cumulative testimony); *Young v.*

*Apfel,* 221 F.3d 1065, 1068 (8th Cir. 2000) (finding that it is harmless error for the ALJ not to explicitly discuss reasons for discounting lay testimony when reasons are stated for disregarding similar testimony by Claimant).

More to the point, however, the ALJ's reasons for discounting Mrs. Shelton's testimony, which focused primarily on Claimant's condition since his psychiatric hospitalizations, are irrelevant to the issues that remain in the case. The elimination of Claimant's SSI action confines this Court's inquiry to whether substantial evidence exists to affirm the Commissioner's denial of Claimant's DIB application. The record reflects that Claimant's psychiatric condition took a significant turn for the worse in January 2009, causing him to seek voluntary admission to the behavioral health unit at St. Mary's Medical Center. Although it is indisputable that Claimant suffered from longstanding mental illness prior to that admission, the record lacks evidence that his depression, anxiety, and periodic auditory hallucinations posed more than a minimal barrier to his ability to engage in substantial gainful activity. To the contrary, Claimant testified that he had successfully performed his employment duties in the past despite having auditory hallucinations, depression, and anxiety.  (Tr. at 68).  In addition, Dr. Young's records confirm that prior to January 2009, Claimant had no mental health hospitalizations, no admissions to crisis units, and only sporadic psychiatric treatment or counseling, which was remote in time to his alleged onset of disability. Claimant admittedly felt better when taking psychotropic medications, (Tr. at 312-15, 324-25), and Dr. Young felt Claimant's mood would further improve if he returned to work. (Tr. at 377-78). Prior to January 2009, Dr. Young consistently observed and documented that Claimant's judgment, insight and orientation were appropriate and, although his affect was flat, he showed no signs of psychosis or suicidal ideations. His mood was

often described as "pleasant." Lisa Tate, a licensed psychologist and agency consultant, performed the only documented psychological evaluation of Claimant that was contemporaneous to his last insured date. (Tr. at 416-20). On January 26, 2008, approximately one month after Claimant's disability insurance expired, Ms. Tate found Claimant to be alert and oriented, with coherent and logical thought processes and without evidence of delusions, obsessive thoughts, suicidal or homicidal ideations. She found Claimant's immediate and remote memory to be normal, his recent memory only mildly deficient, and his concentration, persistence and pace to be normal. Ms. Tate diagnosed Claimant with Major Depressive Disorder, but found his social functioning to be within normal limits and his activities to include watching television, picking up after himself, taking care of his own grooming needs, shopping, doing laundry, mowing the grass, and taking out the trash. (*Id.*). Based upon Ms. Tate's evaluation and the records of Dr. Young, Dr. James Capage completed a Psychiatric Review Technique Form in which he concluded that Claimant's mental impairments were not severe. (Tr. at 428-441). He found no more than mild limitations in Claimant's activities of daily living and social functioning and no limitations in his ability to maintain concentration, persistence, and pace. (Tr. at 438). Dr. Capage offered the opinion that Claimant "seems capable of performing routine ADL's [activities of daily living] if he so desired. He can relate appropriately to others ... It seems he retains the mental-emotional capacity to engage in SGA [substantial gainful activity]." (Tr. at 440). The ALJ expressly relied upon the opinions of the agency consultants in determining that Claimant's mental impairments of depression, anxiety and hallucinations were not severe. (Tr. at 32). Based upon the evidence of record pertinent to Claimant's mental condition on or before December 31, 2007, the Court finds this determination to be supported by substantial

evidence. Accordingly, in light of the recent circumscription of Plaintiff's claim, the ALJ's apparent indifference to the testimony of Claimant's mother was harmless error. *See Higgs v. Bowen,* 880 F.2d 860, 864 (6th Cir. 1988).

### B.   Failure to Fully Evaluate Claimant's Alcohol and Drug Use

Plaintiff next argues that the ALJ failed to conduct a proper analysis of Claimant's mental and physical health during periods of abstinence from drugs and alcohol to determine whether the effects of Claimant's impairments could be separated from the effects of substance abuse. (Docket No. 14 at 11). Relying upon the mandates of the Contract with America Advancement Act of 1996, Pub. L. No. 104-121, 110 Stat. 848, 852 ("CAAA") and 20 C.F.R. § 416.935(b), Plaintiff contends that the ALJ was required to evaluate Claimant's physical and mental limitations and make a finding of whether those limitations remained disabling when Claimant ceased using drugs and alcohol. Pointing to a period of abstinence that began in April 2009 and continued through the time of the administrative hearing in July 2009, Plaintiff asserts that Claimant's condition actually worsened despite a lack of alcohol or drugs in his system; accordingly, the ALJ's determination that Claimant's substance abuse was the cause of his mental impairments was misplaced and contrary to the evidence.

In response, the Commissioner emphasizes that neither the CAAA nor 20 C.F.R. § 416.935(b) required the ALJ to conduct the analysis described by Plaintiff. According to the Commissioner, such an analysis is necessary only after a determination is made that a claimant with a drug or alcohol addiction is disabled. (Docket No. 20 at 16).  Here, Claimant was found not disabled; therefore, the finding necessary to trigger the addiction impact analysis was not made.

The Social Security regulations provide that when a claimant's alcoholism or drug addiction is a contributing factor material to a determination that the claimant is disabled, the claimant "must avail [himself] of appropriate treatment" and "make progress" in the treatment, or disability benefits may be terminated. 20 C.F.R. §§ 404.1536, 416.936.   As a result, when a claimant with medical evidence of drug addiction or alcoholism is found disabled, the ALJ must perform a further evaluation to ascertain if the drug addiction or alcoholism is a contributing factor material to the disability finding. 20 C.F.R. §§ 404.1535, 416.935. However, as the Commissioner correctly states, a further evaluation is not necessary when, as in this case, the Claimant is found not to be disabled.  Consequently, this challenge to the Commissioner's decision is without merit.

In any event, the ALJ's statements regarding Claimant's 2009 drug and alcohol use are inconsequential. The records reveal that Claimant's substance abuse was neither reported by him nor identified by his physicians until Claimant's admission to the behavioral health unit in January 2009.  In fact, Claimant expressly denied any history of drug/alcohol abuse, treatment, or related arrests during his psychological evaluation in January 2008. (Tr. at 417).  Although he admitted to a legal history that included a charge for possession of controlled substances and a DUI, he insisted that these were isolated incidents rather than manifestations of a substance abuse problem. (Tr. at 418). Accordingly, no medical evidence existed in the record as of the date Claimant was last insured to substantiate the presence of alcoholism or drug addiction that would arguably have been material to a disability determination and, thus, would have mandated an analysis of the role of substance abuse in causing Claimant's disability.

### C.   Failure to Fully Consider Claimant's Musculoskeletal Impairments

Plaintiff alleges that the ALJ failed to give proper regard to the effects of Claimant's "degenerative disc disease," such as, severe chronic pain and the side effects of his medication. The Court finds this criticism to be entirely unfounded.  The ALJ provided a comprehensive review of the objective medical evidence and subjective complaints of Claimant regarding his chronic pain, also noting that the medications prescribed for his musculoskeletal conditions caused drowsiness. (Tr. at 29-32). The ALJ explicitly discounted Claimant's subjective complaints, because they were inconsistent with the medical findings, as well as Claimant's statements to medical providers, and his self-described activities.  The ALJ noted that Claimant was diagnosed with cervical, lumbar, and neck strains, rather than degenerative disc disease as suggested by Plaintiff. Claimant's MRI films were negative, and he admitted to experiencing relief from pain when taking Darvocet and after receiving trigger point injections.  When examined by his own expert chiropractor, Claimant was able to fully squat and rise without difficulty and had normal sensory distribution in his spine.  (*Id.*). Similarly, during his examination by Dr. Beard, Claimant complained only of mild pain and tenderness with no muscle spasms and a negative straight leg test. Claimant was able to heel-walk, toe-walk, tandem walk, and squat.  He was comfortable sitting or in the supine position, had no evidence of neurological impairment, and had normal range of motion. Moreover, Claimant's primary treating physician, Dr. Young, having full knowledge of Claimant's symptoms, signs, complaints, and medications, repeatedly encouraged Claimant to return to work. Dr. Young opined that Claimant's condition would likely improve with a resumption of activity and attributed Claimant's inertia to a

lack of motivation rather than a physical inability to function. In keeping with that conclusion, Claimant conceded that he was physically able to mow the grass, complete household chores, perform daily grooming, shop, watch television, and do light exercise. In January 2009, he reported that he walked one mile each day.  In summary, contrary to Plaintiff's contention, the ALJ did fully analyze Claimant's musculoskeletal impairments and their ramifications and provided a detailed explanation of his analysis.

### D. Inadequate Credibility Assessment

As a corollary to Plaintiff's last criticism, she asserts that the ALJ failed to properly consider the reliability of Claimant's statements of pain, performing no apparent assessment of Claimant's credibility. (Docket No. 14 at 13). This particular challenge is thoroughly refuted by the ALJ's written opinion.  Plaintiff contends that the ALJ did not explain his rationale for finding Claimant less than credible and instead simply stated that Claimant was not credible to the extent that he made complaints that were inconsistent with the RFC assessment. While it is true that the ALJ found Claimant's testimony "concerning the intensity, persistence, and limiting effects" of his symptoms to be less than credible "to the extent that [it was] inconsistent with the above residual functional capacity assessment," the ALJ's explanation of his credibility finding did not end with that conclusory statement. (Tr. at 31). To the contrary, the ALJ performed a credibility assessment of Claimant precisely in the manner mandated by 20 C.F.R. § 404.1529 and SSR 96-7p. Social Security Ruling 96-7p sets forth the factors that an ALJ should consider in assessing a claimant's credibility, emphasizing the importance of explaining the reasons supporting the credibility determination. In determining a claimant's credibility, an ALJ must take into consideration "all the available evidence," including: the claimant's subjective complaints; claimant's medical

history, medical signs, and laboratory findings;[6] any objective medical evidence of pain (such as evidence of reduced joint motion, muscle spasms, deteriorating tissues, redness, etc.);[7] and any other evidence relevant to the severity of the impairment, such as evidence of the claimant's daily activities, specific descriptions of the pain, the location, duration, frequency and intensity of symptoms; precipitating and aggravating factors; any medical treatment taken to alleviate it; and other factors relating to functional limitations and restrictions.[8] *Craig v. Cather*, 76 F.3d 585, 595 (4th Cir. 1996). An ALJ's credibility finding:

> must be grounded in the evidence and articulated in the determination or decision. It is not sufficient to make a conclusory statement that "the individual's allegations have been considered" or that "the allegations are (or are not) credible." It is also not enough for the adjudicator simply to recite the factors that are described in the regulations for evaluating symptoms. The determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight. This documentation is necessary in order to give the individual a full and fair review of his or her claim, and in order to ensure a well-reasoned determination or decision.

SSR. 96-7p.

When considering whether an ALJ's credibility determinations are supported by substantial evidence, the Court is not charged with simply replacing its own credibility assessments for those of the ALJ; rather, the Court must review the evidence to determine if it is sufficient to support the ALJ's conclusions. "In reviewing the record for substantial evidence, the Court does not re-weigh conflicting evidence ... or substitute its own judgment for that of the Commissioner." *Hays v. Sullivan,* 907 F.2d 1453, 1456

---

[6] *See* 20 C.F.R. § 404.1529(c)(1).

[7] *See* 20 C.F.R. § 404.1529(c)(2).

[8] *See* 20 C.F.R. § 404.1529(c)(3).

(4th Cir. 1990). Ultimately, credibility determinations as to a claimant's testimony regarding his limitations are for the ALJ to make. *Shively v. Heckler*, 739 F.2d 987, 989–90 (4th Cir. 1984). Because the ALJ had the "opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight." *Shively*, 739 F.2d at 989–90 (citing *Tyler v. Weinberger*, 409 F. Supp. 776 (E.D.Va. 1976)).

Here, the ALJ compared and contrasted Claimant's testimony with the medical records, the recorded statements previously made by Claimant, his treatment, and his reported activities. (Tr. at 30-31). For example, the ALJ noted that although Claimant reported chronic neck and back pain since 2002, all diagnostic testing was negative. Dr. Young consistently noted normal range of motion, stability, and strength.  Claimant testified that his pain was exacerbated by walking and sitting, but Dr. Beard observed no such signs or symptoms when Claimant was sitting, standing, or lying down on the examining table.  Moreover, Claimant reported in January 2009 that he was able to walk a mile for exercise, mow his yard, and do household chores. Claimant testified that he was only able to sit for two hours, yet reported that he spent most of the day watching television.  Claimant testified that medications did not help his condition, yet Dr. Young's records documented Claimant's reports that Darvocet and Lortab reduced his pain, chiropractic care helped decrease pain and increase movement, and trigger point injections "helped a lot."  (*Id.*).  Claimant used no assistive devices, showed only mild tenderness and pain on testing, had no evidence of nerve impingement or atrophy, and no diagnosis of anything more serious than strains. In stark contrast to Claimant's allegation that his pain was disabling, none of the physicians who examined or treated Claimant opined that he was unable to work. In fact, on September 13, 2007, Dr. Young

encouraged Claimant to "get off his [butt] and get out there and do something." (Tr. at 377). In light of the detailed analysis and explicit explanation provided by the ALJ, the Court finds that the ALJ adequately performed and discussed his credibility determination. Further, having considered the record, the Court finds that the ALJ's ultimate determination that Claimant was less than fully credible is supported by substantial evidence.

### E.    Failure to Properly Consider Claimant's Combined Impairments

Plaintiff next argues that the ALJ failed to consider the combined effects of Claimant's mental and physical impairments. (Docket No. 14 at 14-15). More precisely, Plaintiff contends that the ALJ ignored Claimant's testimony regarding his worsening depression, anxiety, and auditory hallucinations, which, when added to his physical impairments, significantly reduced his capacity to work.

The Court agrees that the ALJ was required to consider the combined, synergistic effect of all of Claimant's medically determinable impairments, severe and non-severe, in order to accurately evaluate the extent of their resulting limitations on Claimant. *Walker v. Bowen,* 889 F.2d 47 (4th Cir. 1989). Where there is a combination of impairments, the issue "is not only the existence of the problems, but also the degree of their severity, and whether, together, they impaired the claimant's ability to engage in substantial gainful activity." *Oppenheim v. Finch*, 495 F.2d 396, 398 (4th Cir. 1974). The ailments should not be fractionalized and considered in isolation, but considered in combination to determine the impact on the ability of the claimant to engage in substantial gainful activity. *Id.; See, also, DeLoatche v. Heckler*, 715 F.2d 148, 150 (4th Cir. 1983). As the Fourth Circuit Court of Appeals stated in *Walker,* "[i]t is axiomatic

that disability may result from a number of impairments which, taken separately, might not be disabling, but whose total effect, taken together, is to render claimant unable to engage in substantial gainful activity." *Walker,* 889 F.2d at 50.

Here, the ALJ fulfilled his obligation to evaluate Claimant's impairments, separately and in combination, and specifically addressed how they affected Claimant's functional capacity. The ALJ initially considered Claimant's impairments both alone and in combination at the third step of his analysis, comparing the medical evidence to the severity criteria detailed in the Listing pertinent to the musculoskeletal system. (Tr. at 29). The ALJ determined that Claimant did not have an impairment or combination of impairments that equaled in severity any listed impairment, as no treating or examining physician made findings that would constitute equivalency to the criteria of the relevant listed impairments. (*Id.*). The ALJ then proceeded to evaluate Claimant's RFC given his combination of impairments. The ALJ noted that Claimant's diagnostic studies were normal and his movement and range of motion were also normal. The ALJ reviewed examinations performed by Dr. Young, Dr. Duty, and Dr. Beard, observing that objective findings were minimal and treatment reportedly improved Claimant's symptoms. The ALJ discussed the consultative examination by Ms. Tate and the psychiatric RFC completed by Dr. Capage in which he found no evidence of significant limitations arising from Claimant's psychiatric condition. The ALJ noted that Claimant had recent exacerbations of his psychological symptoms, but related those events to Claimant's drug and alcohol abuse. The ALJ rejected the functional assessments prepared at Prestera, finding them to be non-specific and inconsistent with the objective evidence. (*Id.*).

Clearly, the ALJ considered the combined effect of Claimant's severe and non-severe impairments. When examining the evidence of record reflecting the functional impact of Claimant's combined impairments during the insured period, the Court finds the ALJ's determination that Claimant's impairments, separately and in combination, were not disabling is supported by substantial evidence. While the weight of the evidentiary support for the ALJ's denial of Claimant's SSI application diminishes in the face of Claimant's 2009 psychiatric decline, the inquiry as to whether that denial ultimately was supported by substantial evidence is not before this Court. Therefore, the Court finds no basis upon which to remand this matter for further proceedings.

### F.    Failure to Rebut the Presumption of Disability

Plaintiff's final contention is that the ALJ did not carry his burden to rebut the "presumption of disability." (Docket No. 14 at 17-18).  The Court finds this contention to be entirely without merit. Claimant was responsible for proving his disability, and this responsibility never shifted to the Commissioner, but remained with Claimant.  As such, he bore the burden of providing medical evidence to the Commissioner that established the severity of his impairments.  20 C.F.R. §§ 404.1512(a) and 416.912(a). *See Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981); 42 U.S.C.A. § 423(d)(5)(A) ("An individual shall not be considered to be under a disability unless he furnishes such medical and other evidence of the existence thereof as the Commissioner of Social Security may require.")  While the Commissioner had a duty to go forward with the evidence at the fourth step of the evaluation, Claimant retained "the risk of non-persuasion." *Seacrist v. Weinberger*, 538 F.2d 1054, 1056 (4th Cir. 1976).

At the fourth step of the sequential evaluation, the SSA recognizes that when a claimant proves the existence of severe impairments, which prevent the performance of

past relevant work, the claimant has established a *prima facie* case of disability. The burden then shifts to the Commissioner to produce evidence, as the final step in the process, that the claimant is able to perform other forms of substantial gainful activity, when considering the claimant's remaining physical and mental capacities, age, education, and prior work experiences.  20 C.F.R. §§404.1520(g); See also, *McLain v. Schweiker,* 715 F.2d 866, 868-69 (4th Cir. 1983).  The Commissioner must establish two things: (1) that the claimant, considering his or her age, education, skills, work experience, and physical shortcomings has the capacity to perform an alternative job, and (2) that this specific job exists in significant numbers in the national economy. *McLamore v. Weinberger,* 538 F.2d. 572, 574 (4th Cir. 1976).

In order to carry this burden, the Commissioner may rely upon medical-vocational guidelines listed in Appendix 2 of Subpart P of Part 404 ("grids"), "which take administrative notice of the availability of job types in the national economy for persons having certain characteristics, namely age, education, previous work experience, and residual functional capacity."  *Grant v. Schweiker*, 699 F.2d 189, 191-192 (4th Cir. 1983); See also 20 C.F.R. § 404.1569.  However, the grids consider only the "exertional" component of a claimant's disability in determining whether jobs exist in the national economy that the claimant can perform. *Id.* For that reason, when a claimant has significant nonexertional impairments or has a combination of exertional and nonexertional impairments, the grids merely provide a framework to the ALJ, who must give "full individualized consideration" to the relevant facts of the claim in order to ascertain the existence of available jobs. *Id.* In those cases, the ALJ must establish the availability of jobs through the testimony of a vocational expert. *Id.* As a corollary to this requirement, the ALJ has the right to rely upon the testimony of a vocational expert as

to the availability of jobs types in the national economy that can be performed by the claimant as long as the vocational expert's opinion is based upon proper hypothetical questions that fairly set out all of the claimant's severe impairments. See *Walker v. Bowen,* 889 F.2d 47 (4th Cir. 1989).

In the present case, Claimant never progressed to the fifth and final step of the process, because the ALJ determined, with the assistance of a vocational expert, that Claimant was capable of performing his past relevant employment as a stocker and printer technician, both as he performed those jobs and as they generally are performed. As a result, Claimant failed to establish a *prima facie* case of disability that would shift the burden of going forward with the evidence to the Commissioner. Despite making a finding of no disability at the fourth step of the process, the ALJ nonetheless proceeded to assess Claimant's ability to perform other jobs available in the national and regional economy. Once again, with the assistance of a vocational expert, the ALJ concluded that other jobs existed locally in substantial numbers that Claimant could perform despite his limitations. Plaintiff does not contest the validity of the hypothetical questions or the qualifications of the vocational expert. Accordingly, this challenge is unpersuasive, and the Court finds substantial evidentiary support for the decision of the Commissioner.

## IX.  **Conclusion**

After a careful consideration of the evidence of record, the Court finds that the Commissioner's decision **IS** supported by substantial evidence. Therefore, by Judgment Order entered this day, the final decision of the Commissioner is **AFFIRMED** and this matter is **DISMISSED** from the docket of this Court.

The Clerk of this Court is directed to transmit copies of this Order to all counsel of record.

**ENTERED:** January 25, 2012.

Cheryl A.  Eifert
United States Magistrate Judge